# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## WESTERN DIVISION

UNITED STATES OF AMERICA,

          Plaintiff,

vs.

JUNE MELEIGH YERKES,

          Defendant.

No. CR05-4100-DEO

**REPORT AND RECOMMENDATION**

---

    This matter is before the court on the defendant's motion to suppress evidence (Doc. No. 10). The plaintiff (the "Government") has resisted the motion. (Doc. No. 16) Pursuant to the trial management order (Doc. No. 8), motions to suppress in this case were referred to the undersigned United States Magistrate Judge for review and the issuance of a report and recommended disposition. Accordingly, the court held a hearing on the motions on December 7, 2005, at which Assistant U.S. Attorney Kevin C. Fletcher appeared on behalf of the plaintiff (the "Government"), and the defendant June Yerkes appeared in person with her attorney, Alexander M. Esteves. The Government offered the testimony of the following witnesses, all from the Spencer, Iowa, Police Department: Brian Denny, a patrolman; Brad Rasmussen, a patrolman and field training officer; James Berhaw, a shift supervisor; Mark Lawson, a supervisor; and Chris Nissen, a narcotics investigator. For the defense, June Yerkes testified in her own behalf.

    The following exhibits were admitted into evidence: **Gov't Ex. 1** - "Application and Order Re: Disposition of Evidence" dated July 31, 2004 (1 page); **Gov't Ex. 2** - Search Warrant and related documents (8 pages); **Gov't Ex. 3** - Spencer Police Department Property/Evidence inventory dated 3/19/03 (6 pages); **Gov't Ex. 4** - "Evidence Catalog" (3 pages); **Gov't Ex. 5** - "Statement of Rights" form dated 3/24/03, signed by Chris Nissen and June Yerkes (1 page); **Gov't Ex. 6** - videotape of officers' interview of June

Yerkes on 3/24/03; **Gov't Ex. 7** - "Financial Affidavit/Application for Appointment of Counsel/Order - Finding of Indigency" in Clay County Case No. FECR011439 (1 page). Also admitted into evidence were **Court Ex. 1**, an Amended Transcript of a portion of the March 14, 2003, interview of the defendant, incorporating corrections requested by the parties (7 pages); and **Court Ex. 2** - the defendant's list of requested changes to the court's original interview transcript. On January 5, 2006, the Government delivered to the court the certified court record in *State v. Yerkes*, Clay County Case No. FECR011439. The court hereby admits the certified record into evidence as **Court Ex. 3**.

During the hearing, it became apparent Yerkes was attempting to raise issues that were not set out in her motion or brief. At the conclusion of the hearing, the court directed the parties to supplement the record, and directed Yerkes to file an amended or supplemental motion to suppress and brief. The parties both sought, and were granted, extensions of time to file their supplemental documents, and on January 9, 2006, Yerkes filed an Amended Motion to Suppress and an amended brief (Doc. No. 28). On January 27, 2006, the Government filed its supplemental resistance (Doc. No. 32).

The motion now has been fully submitted, and the court turns to consideration of the motion.

### BACKGROUND FACTS

At about 9:50 p.m. on March 19, 2003, Officer Brian Denny was on patrol in Spencer, Iowa, when he received a report of "suspicious" activities by a customer at the Spencer Wal-Mart store. A Wal-Mart employee had reported to the police department communications center that a female shopper at the store was acting like she was "out of it," and had made some purchases at the store that included a gas can and aluminum foil oven liners. Denny knew from his training and experience that these materials are used in manufacturing methamphetamine. The Wal-Mart employee provided a general

2

description of the vehicle driven by the woman that included a partial license plate. From the description of the vehicle and his involvement in earlier investigations, Denny suspected the woman was the defendant, June Yerkes. Denny drove to Yerkes's apartment, where he set up surveillance. Other officers attempted, unsuccessfully, to locate the vehicle in the area surrounding the Wal-Mart store.

At that time, Denny was aware of intelligence reports implicating Yerkes in possible activities relating to methamphetamine manufacturing. According to a report from the Floyd County Sheriff's office in early 2002, Yerkes had been observed riding in a pickup truck with an individual who made stops along a service route to buy methamphetamine precursors. According to a report from another law enforcement agency, Yerkes had been seen at the residence of a known methamphetamine manufacturer. In May 2002, the Sheldon, Iowa, Police Department reported that Yerkes was purchasing pseudoephedrine regularly at a local pharmacy. In January 2003, the Spencer Police Department received a report from an employee at the Spencer Wal-Mart store that a woman believed to be Yerkes had entered the store and purchased pseudoephedrine, butane lighters, baggies, and other suspicious items. After the January 2003, report, Denny made several visits to the Wal-Mart store, and was advised by a Wal-Mart employee that on four or five occasions after January, a woman believed to be Yerkes had entered the store to purchase pseudoephedrine, plastic gas cans, and oven liners.

About two minutes after Denny set up surveillance on May 19, 2003, he observed Yerkes pull up to her apartment and get out of her car. Denny pulled into the apartment parking lot. It was raining at the time.

Denny testified he parked his patrol car about thirty feet from Yerkes's car, and he walked up to Yerkes.[1] Yerkes was taking some Wal-Mart sacks out of her car. In

---

[1]Denny testified he activated his patrol car's video camera before he approached Yerkes, but his microphone malfunctioned, and there was no audio recording of what transpired during the encounter.

(continued...)

Denny's opinion, Yerkes did not see him until he approached her. Denny told Yerkes about the report the police had received from the Wal-Mart store, and she responded that she did not believe she had done anything suspicious while shopping at the store. Denny observed that Yerkes had quickened body movements and excited behavior. From his experience and training,[2] Denny suspected that Yerkes was under the influence of methamphetamine. He asked her if there was anything illegal in her vehicle, and she responded, "No." He then asked her if he could search her vehicle. Denny testified Yerkes consented to a search of the vehicle, although he could not recall her exact words. Denny had written consent-to-search forms in his patrol car, but he did not use them. He testified his practice was to use the forms for consents to search residences but not for consents to search vehicles. He explained that he followed this practice because there is a greater expectation of privacy for a residence than there is for a vehicle. As Denny started to search Yerkes's car, she walked to an area under a balcony to get out of the rain, carrying some Wal-Mart sacks that had been in her car.

Shortly after beginning the search, Denny discovered a Crown Royal liquor bag at the bottom of one of the Wal-Mart bags on the passenger's seat. Inside the Crown Royal bag, he found several leather pouches. Denny opened one of the pouches and located a bottle that contained a white substance he believed to be methamphetamine. According to Denny, Yerkes walked over to where he was standing at the driver's side door, and commented that she had forgotten those items were in her car. Denny asked Yerkes if the bottle contained methamphetamine, and she replied that it did. Denny then placed Yerkes

[1](...continued)

The video recording of the encounter was erased after state charges arising out of this incident were concluded. Thus, at the time of the suppression hearing, there was no audio or video recording of any part of this encounter.

[2]Denny testified he has dealt with individuals who were under the influence of methamphetamine, and is familiar with how they appear and act. He also has received training to help detect persons who are under the influence of drugs.

under arrest, handcuffed her, and searched her incident to the arrest. In her pockets, he found two pipes containing methamphetamine residue.

Yerkes describes these events somewhat differently. She testified that as she pulled into the parking area of her apartment, she saw Denny's patrol car parked on the street, although she did not know he was waiting for her. As she started to get out of her car, she saw Denny pull his patrol car right behind her car. While she was beginning to take some of the Wal-Mart sacks out of her car, Denny approached her and immediately asked if he could search her car. At one point in her testimony, she stated that her immediate response was, "No." Later in her testimony, she stated the "first thing out of [her] mouth" was something like, "Do you go around asking everybody that?" She stated she was in a hurry to get out of the rain, and she thought she had closed the driver's side door of her car, but when she reached shelter underneath a balcony, she turned around and saw Denny inside her car. She testified that when Denny showed her the Crown Royal bag and asked her about its contents, she did not respond.

Shortly after Yerkes was handcuffed, other officers arrived at the scene. Denny placed Yerkes in the back seat of his patrol car, and he and Officer Berhaw searched Yerkes's vehicle, in which they found additional incriminating evidence. After completing the search, Denny advised Yerkes of her *Miranda* rights, and then asked her if there was anything illegal in her apartment. She responded, "Probably." Denny then asked her to sign a permission-to-search form for her apartment, and she declined. She was transported to jail while officers obtained a state search warrant for the apartment. In a subsequent search of the apartment pursuant to the search warrant, additional incriminating evidence was found. Later that evening, Denny and Officer Nissen, the Spencer Police Department drug investigator, attempted to question Yerkes in an interview room at the jail. She refused to sign an advice-of-rights form or to talk with the officers.

According to state court records from Clay County, Iowa, three criminal complaints were filed in the Iowa District Court in and for Clay County on March 20, 2003, the day after Yerkes's arrest, alleging that she had committed the crimes of possession of methamphetamine with intent to deliver, possession of marijuana with intent to deliver, and violation of tax stamp code. Yerkes had an initial appearance on all charges on the same day, and bond was set at $30,000. On the following day, March 21, 2003, Yerkes completed a financial affidavit and application for appointment of counsel. On March 31, 2003, the Clay County Attorney filed a three-count Information against Yerkes, charging her with possession of methamphetamine and marijuana with intent to deliver, and a tax stamp violation. On the same date, a State court judge found Yerkes was entitled to court-appointed counsel, and approved her application for appointment of counsel to represent her.

On March 24, 2003, between the time Yerkes completed her application for appointment of counsel and the time she was formally charged in State court and her application for counsel was approved, Officers Nissen and Denny had Yerkes brought back to the interview room. The interview began as follows:

> NISSEN: The following is a recorded interview. It is 8:53 on March 24th. Okay, June, like I said, the first thing I'm going to do is read you your rights, okay?
>
> YERKES: Yes, sir. Everything you said is truthful, everything?
>
> NISSEN: I've got no reason to lie to you, okay? It does me no good.
>
> YERKES: Swear.
>
> NISSEN: Okay. I will refer – What I'm going to do, okay, I'm going to take notes on everything you say, and if I've got to refer back to the videotape, I will. Okay. I'm going to write that report and I'm going to send it to the U.S. Attorney's office, okay?

| | |
|---|---|
| YERKES: | What is the outcome of what I say? What's the outcome of what I say? |
| NISSEN: | What do you mean? |
| YERKES: | What will be the outcome of what I say? Like if I say, "Joe Blow – I got this from Joe Blow" -- |
| NISSEN: | Uh-huh. |
| YERKES: | – then does that mean you're going to go arrest him? |
| NISSEN: | No. Just because – If you tell me that – |
| YERKES: | Because I might be hurting people I care about. |
| NISSEN: | Well, that's why you're going to have to make a decision, okay, whether you're going to worry about yourself or people you care about. Let's go ahead and read these, okay, so we can talk openly and freely, okay? Before you answer any questions or make any statements, you must fully understand your rights. You have the right to remain silent. |
| YERKES: | I might need some of these (indicating empty Kleenex box). |
| NISSEN: | Okay. Anything you say can and will be used against you in a court of law. |
| YERKES: | Okay. |
| NISSEN: | You have the right to consult with a lawyer before you answer any questions or make any statements and have a lawyer present during questioning. If you cannot afford a lawyer, one will be appointed to you before any questioning or at any time during questioning, if you so desire. |
| YERKES: | How come I haven't heard from one yet? |
| NISSEN: | I'm not sure. |
| YERKES: | Because I gave the – the night – They took me up there, I filled out the paper and I gave it to the older |

|  |  |
|---|---|
|  | gentleman for a court-appointed and I haven't heard anything. |
| NISSEN: | Well, that's something that the court system has to do. |
| YERKES: | Will this screw up with that? |
| NISSEN: | What do you mean? |
| YERKES: | Will this interfere with that? |
| NISSEN: | Getting an attorney? |
| YERKES: | Yes. |
| NISSEN: | No. |
| YERKES: | Okay. |
| NISSEN: | Okay. If you answer any questions or make any statements without consulting a lawyer or without having a lawyer present during questioning, you still have the absolute right to stop answering questions or making statements until you consult with a lawyer or have a lawyer present during further questioning. |
| YERKES: | Should I have one here? |
| NISSEN: | That's up to you. If you want an attorney, I'm not going to ask you any questions. |
| YERKES: | Can I do that with an – do the same thing with an attorney? |
| NISSEN: | It's going to be at your attorney's discretion. |
| YERKES: | But I can still do this if I have an attorney? |
| NISSEN: | Sure. |
| YERKES: | Should I wait? |
| NISSEN: | That's up to you. |
| YERKES: | You have like a little thing with your lip right here (indicating her upper lip). |
| NISSEN: | Sorry. |

[Laughter.]

NISSEN: If you're in a position where you want to talk to me right now and Officer Denny, we're going to listen, okay.

YERKES: I know.

NISSEN: If you want an attorney here, we're not going to talk to you right now because you – we can't magically appear an attorney for you.

YERKES: But it still can be done with my – with an attorney?

NISSEN: Sure.

YERKES: Can I do that? Just because I – that sounds right.

NISSEN: If that's what you want to do.

YERKES: Yeah.

NISSEN: Okay, what I'm going to do, I'm going to fill out a form. It's called a Financial Affidavit. I think you're going to need a federal defense attorney.

YERKES: What does that mean?

NISSEN: It means you're probably going to be charged federally.

YERKES: So the local one is not even going to work?

NISSEN: They will not represent you in federal court.

YERKES: Is that why I'm not getting any notice or anything?

NISSEN: I don't know. We have nothing to do with getting you an attorney.

YERKES: Okay.

NISSEN: That goes through the court system.

YERKES: Right.

NISSEN: They get you an attorney.

YERKES: Okay.

| | |
|---|---|
| NISSEN: | But a state – an attorney's got to be, I don't know, blessed by somebody to defend people in federal court. |
| YERKES: | Okay. |
| NISSEN: | Which most of the defense attorneys that I deal with are out of Sioux City because they're there, I don't know why. |
| YERKES: | Okay. |
| NISSEN: | But, you know, nothing's going to hurt you to sit here and talk to us right now. If I ask you a question and you don't want to answer it, (indicating advice-of-rights form) you still have the absolute right to stop making statements or answering questions until you consult with a lawyer. |
| YERKES: | Okay. |
| NISSEN: | Okay, do you understand that? |
| YERKES: | I do. |
| NISSEN: | So, do you want to go forth with an interview? |
| YERKES: | I'm confused (unintelligible, with hands over mouth.) |
| NISSEN: | Okay. I'm just going to sign this (indicating advice-of-rights form) because I've already read it. |
| YERKES: | Okay. |
| NISSEN: | Number five is important, I guess, will kind of answer your question. |
| YERKES: | (Reads paragraph 5 of advice-of-rights form to herself in a whisper.) |
| NISSEN: | If you agree and want to cooperate with me right now – |
| YERKES: | Right. |
| NISSEN; | – and I ask you about something you don't want to answer, don't answer it. |
| YERKES: | All right. |

NISSEN:          Okay?

YERKES:          All right.

NISSEN:          Do you understand that?

YERKES:          I do.

NISSEN:          Okay.

YERKES:          Sign the fucker and get it over with.  (Reading from advice-of-rights form:) The above statements have been explained to me and I fully understand my rights . . . (continues reading in whisper, then:) Straight up, everything.

NISSEN:          What is your question?

YERKES:          It's not a question, it's more of a statement.

NISSEN;          I'm confused.

YERKES:          Ha, ha, ha.  (Hesitating, with pen in hand.)

NISSEN:          What?  Read it.  Now I want you to understand it, I'm not trying to hide nothing.

YERKES:          (Reads to herself, in a whisper.)  Yeah.  (Signs advice-of-rights form.)  I have to . . . I don't know about this number here.

NISSEN:          No, that's my badge number.

YERKES:          There you are.

NISSEN:          What's that?

YERKES:          It's thirty-one.

NISSEN:          Uh-huh.

YERKES:          Tim's your younger brother?

NISSEN:          No, he's my older brother.  If you want to openly discuss my brother, that's fine with me because. . . .

YERKES:          I thought he was – I thought you were older than him, actually.  You're right, now that I think about it.

| NISSEN: | Okay, how do you spell your last name? |
| YERKES: | Y-e-r-k-e-s. |
| NISSEN: | K-e-s. And what's your date of birth? |
| YERKES: | 04-27-61. |

Yerkes proceeded to give a detailed statement about her involvement in methamphetamine manufacturing activities.

Officer Nissen testified Yerkes was upset and tearful when she was brought down for the interview. He did not believe she was represented by a lawyer at the time, but Yerkes told him she had requested a lawyer when she had appeared in State court. When Officer Nissen was asked, during the hearing, why he started to assist Yerkes in filling out a financial affidavit for the appointment of an attorney in federal court, he testified he believed it was likely that charges would be filed against Yerkes in federal court because she was involved in manufacturing methamphetamine. Yerkes testified that after she told Nissen she wanted a lawyer, he diverted her attention by talking about the federal financial form. Nissen testified he did not believe Yerkes made a request for a lawyer during questioning.

## DISCUSSION

In her amended motion to suppress (Doc. No. 28), Yerkes argues the facts were insufficient to raise a reasonable suspicion in Officer Denny's mind that she was committing, or was about to commit, a crime, for purposes of justifying the officer in stopping and questioning her pursuant to *Terry v. Ohio*, 391 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). She further argues the officer searched her car without her consent or a warrant. She argues her statements to the officers on March 24, 2003, were taken in violation of her constitutional right to counsel, and furthermore, her statements were not

sufficiently attenuated from the illegal search of her vehicle to remove the taint of the illegal search.  (*See* Doc. No. 28)

The Government argues Officer Denny had both reasonable suspicion and probable cause to stop Yerkes and search her vehicle, and in any event, Yerkes consented to the search of her vehicle.  The Government also argues the officers' interview of Yerkes on March 24, 2003, was proper, and not in violation of her right to counsel.  (*See* Doc. No. 32)

These are the issues the court must address.

## A.  *Stop of Yerkes and Search of Vehicle*

The United States Supreme Court has held repeatedly that "searches and seizures conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 372, 113 S. Ct. 2130, 2135, 124 L. Ed. 2d 334 (1993) (internal quotation marks, citations omitted).  One such exception was recognized by the Court in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).  *Terry* considered the right of a police officer to stop and inquire of a person engaging in suspicious activity which leads the officer to believe a crime may be taking place.

The Government argues the initial contact between Office Denny and Yerkes, where the officer approached her and asked whether she had been acting suspiciously at Wal-Mart, was not a stop at all, but was "the sort of consensual encounter that implicates no Fourth Amendment interest." *Florida v. Rodriguez*, 469 U.S. 1, 5-6, 105 S. Ct. 308, 311, 83 L. Ed. 2d 165 (1984); Doc. No. 32 at 3.  The court agrees.  When Officer Denny approached Yerkes's vehicle, she had already stopped the vehicle and was getting out.  The officer did nothing to stop or impede her movements or to seize her in any way.  The

Eighth Circuit Court of Appeals has held, "'We adhere to the view that a person is "seized" only when, by means of physical force or a show of authority, his freedom of movement is restrained.'" *United States v. Poitier*, 818 F.2d 679, 683 (8th Cir. 1987) (quoting *United States v. Mendenhall*, 446 U.S. 544, 553, 100 S. Ct. 1870, 1876, 64 L. Ed. 2d 497 (1980)).

Furthermore, even if the officer's initial encounter with Yerkes was a "stop" under *Terry*, when the officer approached Yerkes, he had "a reasonable articulable suspicion of criminal activity." *See Terry, supra*. The officer was familiar with Yerkes and her vehicle from previous reports of suspicious activities. He had a timely report that a woman matching Yerkes's description, and driving a car matching the description of Yerkes's car, had been in Wal-Mart acting strangely. "In deciding whether the requisite degree of suspicion exists, we view the [officers'] observations as a whole, rather than as discrete and disconnected occurrences. Further, these observations must be viewed through the eyes of persons who, like the [officers] in this case, are trained to cull significance from behavior that would appear innocent to the untrained observer." *Poitier*, 818 F.2d at 683. The court finds the officer was justified under *Terry* in approaching Yerkes and speaking with her about the report from the Wal-Mart employee.

Officer Denny and Yerkes agree that shortly after the encounter began, Officer Denny asked Yerkes for consent to search her car. Officer Denny testified she consented to the search, and Yerkes testified she responded, "No," when he asked for permission to search the car. Thus, the court is faced here with an old-fashioned swearing match, and must decide whose testimony is credible. "'It is for [the fact-finder] to assess the credibility of witnesses and resolve conflicting testimony.'" *United States v. Cabrera*, 116 F.3d 1243, 1245 (8th Cir. 1997) (quoting *United States v. Cunningham*, 83 F.3d 218, 222 (8th Cir. 1996)).

The court finds Yerkes gave Officer Denny permission to search her car. Officer Denny's testimony was completely credible. Yerkes's testimony, on the other hand, was problematic. She first testified that she responded to the officer's request for permission to search her car by saying, "No," but she later testified she responded to the request by asking, "Do you go around asking everybody that?" These statements are not consistent. Yerkes also testified that after she said "no" to the officer, she simply closed her car door and walked away from the officer to seek shelter from the rain under a balcony. When she turned around, she observed officer searching her car. The court does not believe this is what occurred. It is unlikely that Yerkes would simply walk away from the officer after saying "no" to his request to search her car, and then stand by and watch without protest while the officer did so.

The court finds Yerkes gave consent for the search. As a result, the search was lawful, and Yerkes's motion to suppress evidence seized from her car should be denied.

Having discovered illegal substances in the vehicle, the officer had probable cause to arrest Yerkes, and to search her incident to the arrest. *See United States v. Pratt*, 355 F.3d 1119, 1124 (8th Cir. 2004) ("The search of an arrestee's person has long been upheld as reasonable under the Fourth Amendment. . . .") Thus, the evidence seized from Yerkes's person also was seized lawfully and should not be suppressed. Furthermore, the search of her apartment, which was authorized by a warrant that was supported by probable cause established by lawfully-obtained evidence, also was proper.

## B.    *Constitutionality of March 24, 2003, Interview*

Before addressing this issue, the court first must determine whether the analysis of Yerkes's argument is controlled by the Fifth Amendment or the Sixth Amendment.

The Eighth Circuit Court of Appeals has held that the filing of a complaint does not constitute a "formal charge" giving rise to the Sixth Amendment right to counsel. *United*

*States v. Moore*, 122 F.3d 1154 (8th Cir. 1997). The *Moore* court held the filing of a complaint serves as the basis for a probable cause determination, but does not commit the government to prosecution of the defendant – something that occurs only when "'adversary judicial proceedings have been initiated . . . whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" *Id.* at 1155-56 (quoting *Kirby v. Illinois*, 406 U.S. 682, 688-89, 92 S. Ct. 1877, 1881-82, 32 L. Ed. 2d 411 (1972)).

The court finds the filing of the three criminal complaints against Yerkes in State court on March 20, 2003, did not give rise to her Sixth Amendment right to counsel. Although she had completed a written application for an attorney to represent her in connection with her preliminary hearing, her Sixth Amendment right to counsel did not attach until she was formally charged by the information filed on March 31, 2003. As a result, the analysis of whether Yerkes's rights were violated during the March 24, 2003, interview must be made in light of her Fifth Amendment right against self-incrimination.

The Supreme Court long has recognized that custodial interrogations are inherently coercive. *See Dickerson v. United States*, 530 U.S. 428, 434-35, 120 S. Ct. 2326, 2331 (2000); *New York v. Quarles,* 467 U.S. 649, 654, 104 S. Ct. 2626, 2630, 81 L. Ed. 2d 550 (1984) (both citing *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)). In *Miranda v. Arizona*, the Supreme Court observed that custodial interrogations, by their very nature, generate "compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." 384 U.S. 436, 467, 86 S. Ct. 1602, 1624, 16 L. Ed. 2d 694 (1966).

"To combat this inherent compulsion, and thereby protect the Fifth Amendment privilege against self-incrimination, *Miranda* imposed on the police an obligation to follow certain procedures in their dealings with the accused." *Moran v. Burbine*, 475 U.S. 412, 420, 106 S. Ct. 1135, 1140, 89 L. Ed. 2d 410 (1986). These procedures include fully

apprising a suspect of the prosecution's intention to use her statements to secure a conviction and informing her of her rights to remain silent and to have counsel present if she so desires. *Miranda*, 384 U.S. at 468-70, 86 S. Ct. at 1624-26. If the suspect indicates in any manner prior to or during questioning that she wishes to remain silent or wants an attorney, any interrogation must cease. *Id*. at 473-74, 86 S. Ct. at 1627.

Statements elicited from a suspect by police questioning after the suspect has communicated to the police her wish to remain silent generally are inadmissible. As the Eighth Circuit Court of Appeals held in *United States v. Cody*, 114 F.3d 772 (8th Cir. 1997):

> Once a person in custody has invoked her right to remain silent, admissibility of any of her subsequent statements depends on whether her "'right to cut off questioning' was 'scrupulously honored.'" [*Michigan v.*] *Mosley*[,] 423 U.S. [96,] 104, 96 S. Ct. [321,] 326[, 46 L. Ed. 2d 313] (quoting *Miranda*, 384 U.S. at 474, 479, 86 S. Ct. at 1628, 1630).

*Id.*, 114 F.3d at 775.

In *Edwards v. Arizona,* 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981), the Supreme Court held that a suspect who has "expressed his desire to deal with the police only through counsel is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id*, 451 U.S. at 484-85, 101 S. Ct. at 1884-85. *See also Winnick v. Mississippi*, 498 U.S. 146, 111 S. Ct. 486, 112 L. Ed. 2d 489 (1990) (*Edwards* rule applies to prohibit police from reinitiating interrogation even after the accused has consulted with an attorney); *Arizona v. Roberson*, 486 U.S. 675, 682-85, 108 S. Ct. 2093, 2098-2100, 100 L. Ed. 2d 704 (1988) (*Edwards* rule applies where police-initiated interrogation follows a request for counsel in a separate investigation); *but see Moran v. Burbine*, *supra* (where police fail to inform suspect of attorney's

prearraignment efforts to reach him, neither *Miranda* nor the Fifth Amendment requires suppression of confession after voluntary waiver of *Miranda* rights).

In order to determine whether the "rigid prophylactic rule" of *Edwards* applies in a given situation, courts must determine whether the accused has actually invoked her right to counsel. *Davis v. United States*, 512 U.S. 452-53, 458 114 S. Ct. 2350, 2355, 129 L. Ed. 2d 362 (1994) (suspect must unambiguously request counsel) (citing *Smith v. Illinois,* 469 U.S. 91, 95, 105 S. Ct. 490, 492, 83 L. Ed. 2d 488 (1984) (*per curiam* ), *quoting Fare v. Michael C.,* 442 U.S. 707, 719, 99 S. Ct. 2560, 2569, 61 L. Ed. 2d 197 (1979)); *see also McNeil v. Wisconsin,* 501 U.S. 171, 178, 111 S. Ct. 2204, 2209, 115 L. Ed. 2d 158 (1991). Invocation of the right to counsel must be clear and unequivocal, and police officers do not have a duty to try to clarify an ambiguous statement. *See United States v. Plummer*, 118 F. Supp. 2d 945, 952 (N.D. Iowa 2000) (Bennett, C.J.).

At the suppression hearing, Officer Nissen testified that after Yerkes's arrest, he and Officer Denny attempted to interview Yerkes while she "was still in a holding room . . . prior to being booked up into the jail." The Assistant U.S. Attorney asked Officer Nissen to describe what happened, and the officer testified as follows:

> It would have been in the early morning of the 20th I guess when we completed the search [of Yerkes's residence]. We had Miss Yerkes come to an office within the police department there, and we asked her if she wanted to conduct an interview and talk about her narcotics information. I read her her Miranda rights, and she refused to sign the form, and I noted that on the form. She was returned to the jailer and booked into the jail.

Thus, there is no dispute that Yerkes unequivocally evoked her right to remain silent when she declined to sign the waiver-of-rights form and talk with officers at the time of her arrest.

There is no evidence that Yerkes later changed her mind and asked to talk with officers before the March 24, 2003, interview. Rather, the Officer Nissen admitted that he re-initiated contact with Yerkes. Nissen testified:

> On March 24 of 2003, Miss Yerkes was still in custody in the Clay County Jail. Myself and Officer Denny requested that the jailer bring her down from the jail as we were going to attempt to interview her again. The jailer did so, and we conducted the interview within the police department.

*Id.* It was during this second interview, as set forth above, that Yerkes ultimately agreed to waive her *Miranda* rights and talk with officers.

On March 19, 2003, Yerkes, after she was advised of her *Miranda* rights, refused to talk with the police. On March 21, 2003, she formally requested court-appointed counsel. Once Yerkes invoked her right to remain silent and then asked for an attorney, she was not subject to further interrogation until counsel was made available to her, unless she herself initiated further discussions with the police. *See Edwards*, 451 U.S. at 484-85, 101 S. Ct. at 1884-85. The police had no right to initiate questioning on March 24, 2003, and in doing so, they violated Yerkes's rights under the Fifth Amendment to the Constitution.

Furthermore, during the questioning on March 24, 2003, Yerkes again asked for an attorney, and again her request was ignored. While Officer Nissen was advising Yerkes of her *Miranda* rights, she interrupted him several times with questions about whether she could or should wait for an attorney to be appointed before she answered any questions. Officer Nissen answered all of these questions appropriately. Then, the following exchange occurred:

NISSEN:      If you want an attorney here, we're not going to talk to you right now because you – we can't magically appear an attorney for you.

YERKES:      But it still can be done with my – with an attorney?

| NISSEN: | Sure. |
|---------|-------|
| YERKES: | Can I do that?  Just because I – that sounds right. |
| NISSEN: | If that's what you want to do. |
| YERKES: | Yeah. |

At this point in the questioning, Yerkes made a clear and unequivocal invocation of her right to counsel.  Rather than respecting this request and ceasing his questioning of Yerkes, Officer Nissen told her he was going to help her fill out a financial affidavit because he thought she was "going to need a federal defense attorney."  When she asked what that meant, Nissen told her it meant she was "probably going to be charged federally."  When she then asked whether this was the reason she had not heard anything on her request for a lawyer, Nissen responded, somewhat inconsistently (given that he supposedly was helping her fill out the financial affidavit for a federal defense attorney), that he had "nothing to do with getting [her] an attorney."  He then proceeded to talk her into answering his questions by emphasizing that if he asked her a question she did not want to answer, she did not have to answer it, and by telling her, "[N]othing's going to hurt you to sit here and talk to us right now."

Under these circumstances, the court finds the officers' re-initiating contact with Yerkes for purposes of an interview was a violation of Yerkes's Fifth Amendment rights.  She had asserted her right to remain silent, and she had not re-initiated contact with officers, or stated she had changed her mind and wished to waive her rights and talk with officers.  Even had the March 24th interview with Yerkes been her first encounter with officers, the court would find that Yerkes did not make a knowing, voluntary waiver of her *Miranda* rights.

The court is mindful of the fact that "[w]hen a suspect invokes the right [to remain silent], . .. the police are not entirely prohibited from reinitiating questioning." *United States v. McClinton*, 982 F.2d 278, 281 (8th Cir. 1992) (citing *Michigan v. Mosley*, 423

U.S. 96, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1976)). However, certain factors are relevant in determining whether a suspect's right of silence has been "scrupulously honored." The *McClinton* court described these factors as follows:

> In *Mosley*, the Supreme Court relied on three factors to determine whether the police "scrupulously honored" the person's right of silence: "(1) there was an immediate cessation of questioning upon defendant's request; (2) a 'significant amount of time' had passed since the last session and a new set of [*Miranda*] warnings was given; and (3) the second interrogation involved inquiries concerning a separate crime." *United States v. House*, 939 F.2d 659, 662 (8th Cir. 1991) (citing *Mosley*).

*McClinton*, 982 F.2d at 281.

In the present case, the first two factors are present, but not the third. Officers immediately stopped questioning Yerkes on March 20, 2003, when she invoked her right to remain silent. A 'significant amount of time' had passed by March 24, 2003, when they again initiated contact to interview her, and they once again advised her of her *Miranda* rights. However, the officers' questions during the March 24th interview concerned the same crime as their attempted interview on March 20, 2003.

Considering all of the circumstances of this case, the court concludes Yerkes's right of silence was not 'scrupulously honored,' and her waiver of rights, although voluntary, was not knowing and intelligent. Therefore, her motion to suppress her March 24, 2003, statements should be granted.

## IV. CONCLUSION

For the above reasons, **IT IS RESPECTFULLY RECOMMENDED** that the defendant's motion to suppress the evidence seized from her car and residence be **denied**, and her motion to suppress her statements to officers during the March 24, 2003, interview be **granted**. Any party who objects to this report and recommendation must serve and file

specific, written objections by **February 17, 2006**.  Any response to the objections must be served and filed by **February 24, 2006.**

 **Any party planning to lodge objections to this report and recommendation must order a transcript of the hearing promptly.**

 **IT IS SO ORDERED.**

 **DATED** this 7th day of February, 2006.

PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT